(21 App. Div. 435.)

## TRUSTEES OF FREEHOLDERS, ETC., OF TOWN OF SOUTHAMPTON v. BETTS et al.

(Supreme Court, Appellate Division, First Department.    October 22, 1897.)

COMMON LANDS—POWER TO CONVEY.

> With regard to undivided lands, the legal title to which was vested by patent in town trustees in trust for the individual proprietors, the town trustees being elected by all voters of the town, whether proprietors or not, Laws 1818, c. 155, conferred the power to manage and sell the same on trustees of the proprietors, to be elected by them alone, with a proviso that nothing therein should be construed to give the proprietors or their trustees power to make regulations concerning the waters (other than mill streams), the fisheries, the seaweed, or any other productions of the waters, or in any way to debar the inhabitants of the town from the privilege of taking seaweed from the shores of any of the common lands of the town, or carting to or from or landing property on said shores, as theretofore practiced; which waters, etc., it provided, should be managed by the town trustee for the benefit of the town as they had theretofore had the power to do, with a further proviso that nothing therein contained should affect the right, title, or interest of any person or the inhabitants of the town to any of the beforementioned premises. *Held*, that there was no exception of the beach or seashore from the undivided lands which the trustees of the proprietors were given the power to sell.

Appeal from special term.

Action by the trustees of the freeholders and commonalty of the town of Southampton against Frederic H. Betts and another. From a judgment on verdict in favor of defendants by direction of the court, dismissing the complaint, plaintiffs appeal. Affirmed.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, INGRAHAM, and PARKER, JJ.

James C. Carter, for appellants.
Elihu Root, for respondents.

WILLIAMS, J. The action was brought to recover real property, and the possession thereof, with damages for withholding the same. The property in question was granted to the plaintiffs by the Andros patent of 1676, and confirmed by the Dongan patent of 1686. The plaintiffs claim they have never parted with or been deprived of the title so acquired. The defendants claim that by virtue of the provisions of chapter 155 of the Laws of 1818 the power to manage and sell and convey said property was conferred upon the "trustees of the proprietors of the common undivided lands of the town of Southampton," chosen and elected pursuant to the provisions of that act, and that the title to the property has been transferred by such new trustees to, and is now held by, the defendants. The court of appeals in the case of Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1, 22 N. E. 387, held that under the Andros patent title to the property covered thereby vested in the town (the plaintiff here), a corporate body created by the patent, and that such title was not changed or altered by the Dongan patent, but the later patent merely confirmed the title to the common, undivided lands in the town, and did not vest title thereto in the individual proprietors as tenants in common. With reference to the effect of the act of 1818 the court said that prior to the year 1818 the town held undisputed possession of the unallotted

lands and of the water within the town, and claimed and assumed
to hold the legal title. The equitable rights of the proprietors were
recognized by frequent divisions among them of the income from the
lands, and by frequent allotment of lands among them. In the year
1818 the legislature enacted a law which authorized the proprietors,
by a majority vote, to elect from their number trustees, with such
power to manage all the undivided lands of the town "as the trustees
of the freeholders and commonalty of the town of Southampton now
have," and empowered such trustees to sell, lease, or partition the
same; but especially reserved to the town trustees the management of
the waters, fishing, seaweed, and productions of the waters, "for the
benefit of the town, as they had power to do, before the passage of
this act." Since the enactment of this law, the common lands have
been managed by the trustees elected by the proprietors, and the
waters and their product have been managed by the town. The
property involved in that action was under water, and one claim of
title made by the defendant was under a conveyance from the trustees
of the proprietors. Clearly, such trustees, under the act of 1818,
acquired no rights in property under water, and no power to sell
or convey the same. The title to such property remained in the town.
No rights were, by virtue of the provisions of that act, conferred upon
the trustees of the proprietors. The controversy here is not as to
property under water, but as to a strip of the seashore from high-water
mark back over the sand hills, beach, bank, or dunes, so called, to the
highway at the southerly margin of the town pond; and the question
here involved is whether, under and by virtue of the act of 1818, the
right to manage this beach or seashore, and power to sell the same,
was conferred upon the trustees for the proprietors. The plaintiffs
do not claim that since the act of 1818 they have had power to sell any
of the undivided lands which have been held in trust for the propri-
etors. They concede that such power which they did possess and
exercise prior to the act of 1818 was taken away from them, and con-
ferred upon the trustees for the proprietors, by that act. What they
do claim is that prior to the act of 1818 the beach or seashore had,
by the acts and consent of the parties, become public property, and
had come to be held by the town trustees, not for the proprietors, but
for the general public, so that it could not be sold or dealt with for
the benefit of the proprietors at all; and that by the act of 1818 it was
excepted and reserved from the common, undivided lands, so called,
which the trustees for the proprietors were given the power to manage
and sell. We find no warrant in the evidence for the claim that by the
acts and consent of the parties the beach or seashore had become the
property of the general public before the passage of the act of 1818.
We do not deem it necessary to consider the evidence in detail bearing
upon this question. It has been fully discussed by counsel, and we
have carefully considered the evidence and the suggestions of counsel
with reference to it, and we are satisfied that there is no evidence in
the case that would justify a jury in finding that at the time of the
passage of the act of 1818 the beach or seashore was held by the town
trustees upon any different trust than the other undivided lands of the
town were held; that is, for the benefit of the proprietors. The most

that can be claimed from the evidence is that it shows a right to use the beach or seashore for some purposes; but such right would be a mere easement, and would not be inconsistent with the continuance of the equitable title in the proprietors. Nor did the act of 1818 except or reserve the beach or seashore from the common, undivided lands, which the trustees for the proprietors were given the power to manage and sell. The act provides that:

"It shall and may be lawful for the proprietors of the undivided lands and meadows, held by them as tenants in common in the town of Southampton, * * * to elect * * * trustees to manage all the undivided land, meadows and mill streams in said town; that the said trustees shall have the same power to superintend and manage the undivided lands, meadows and mill streams aforesaid, as the trustees of the freeholders and commonalty of the town of Southampton now have and shall have full power to sell, lease or partition, and to make such rules and regulations and by-laws for managing the said lands, meadows and mill streams, and meadows that may hereafter make in the waters of said town, that shall not be the property of individuals, and also to impose * * * penalties, &c., * * * to sue for and recover * * * penalties—to prosecute * * * suits for all trespasses, which may be hereafter committed on the said lands, meadows and mill streams—provided * * * that nothing in the * * * act shall be construed to give the proprietors or their trustees, any power to make any laws, rules or regulations, concerning the waters (other than mill streams) the fisheries, the seaweed, or any other productions of the waters of said town, or in any manner or way to debar the inhabitants of said town from the privilege of taking seaweed from the shores of any of the common lands of said town, or carting or transporting to or from or landing property on said shores, in the manner hereinbefore practiced, which waters, fisheries, seaweed and productions of the waters, shall be managed by the trustees of the freeholders and commonalty of the town of Southampton, for the benefit of said town, as they had the power to do before the passing of this act, and provided—that nothing herein contained, shall in any manner affect or alter the right, title or interest of any person or the inhabitants of said town, to any of the before mentioned premises."

The meaning of this statute is quite clear. The title to all the undivided property had theretofore been in the town trustees, but they held it in trust for the proprietors, subject to such rights and interests as had been acquired by others therein. The town trustees were elected by all the voters of the town, whether proprietors or not. By this act the proprietors alone were empowered to elect trustees from among their own numbers, who were given the power to superintend and manage the lands, meadows, and mill streams which remained undivided, to make rules and regulations, and prescribe penalties, etc., with reference thereto, and to sell, lease, and partition the same. The provisos in the act were inserted merely to make it clear that the legislature did not intend to give the trustees for the proprietors power to superintend or manage, or in any way regulate, the waters, fisheries, seaweed, or other product of the waters, or to debar the inhabitants from taking or carting away seaweed, or carting to or from or landing property on the shores, as they had been accustomed to do; and that the waters, fisheries, seaweed, and productions of the waters should be managed by the town trustees for the benefit of the town, as they had power to do before the act was passed; and that the act was not intended to affect or alter any right, title, or interest of any person or the inhabitants in the property. We find in the act no

intent to except the beach or seashore from the undivided lands which the trustees of the proprietors were given the power to sell. Whatever rights had been acquired by others to the use of the beach and shore were not taken away or interfered with, and any sale by such trustees would be subject thereto. No power was left in the town trustees, however, to sell or make any partition of the beach or shore, or in any way deal with the title thereto. That power was conferred upon the trustees for the proprietors. The language of the act is general,—"all undivided lands." The beach or shore was land, and it was undivided. There is no express exception or reservation of any lands which remained undivided. The first proviso, so far as lands are concerned, only relates to the use of the beach or shore by taking seaweed from it, and carting or transporting to and from or landing property on such shore. This proviso makes no reference to the management or regulation of the lands constituting the beach or shore by either class of trustees, but merely provides for the management and regulation of the waters, fisheries, and taking of seaweed and the production of the waters. It then provides that the right given to the new trustees shall not in any manner debar the inhabitants of the town from the privilege of taking seaweed from the shores of the common lands, as they had been accustomed to do. The phrase "common lands of the town," used in this proviso in reference to the taking of seaweed from the shore thereof, evidently was used to designate lands held in common by the proprietors, and not in any technical sense as indicating that the shores or lands were public property. This is the only way in which the common lands are referred to in the act, and it is quite clear that that reference is not by way of taking from the new trustees the right to manage the common lands, but only limiting that right so that they shall not deprive the inhabitants from the right to take seaweed from them. Indeed, the very proviso necessarily involves the proposition that, but for it, the right to manage the common lands in its entirety is given to these new trustees, as, indeed, it is. The only limit to that right is found in this proviso, and that is that their management shall not extend to take away from the inhabitants of the town the privilege of taking seaweed. In all other respects their right to manage is not affected, but the right to take seaweed from the shore is to be controlled by the old trustees as they had been accustomed to do. This is the plain and clear effect, as it seems to us, of this proviso; and all the effect that can be given to it. It is said that by the term "common lands," as used in that proviso, is meant something different from the term "undivided lands," as used in the former part of the act, and the necessary result of the difference in the use of the terms is to imply that there were two kinds of lands owned by the town, one of which was the undivided upland and the other the lowlands or beach, which had not been divided, and which never were divided. We can find no authority whatever for giving to this term any such meaning. It is quite clear, as disclosed by the case, that the terms "undivided lands" and "common lands" were used interchangeably to refer to the uplands and to the beaches as well. Many of the resolutions of the trustees, as well before as after the law of 1818, refer to the common lands, and, again

describing the same lands, call them undivided lands. The old records of the town made prior to that time used various phrases to designate the lands held for the proprietors. The record of the proprietors' interests were entitled "Commonage Books." The rights of the proprietors were described in the records as "rights in commonage," and the lands were described in the records variously as "commons" and "common lands." There is no warrant anywhere in the case, so far as we can discover, for giving any different meaning to the two phrases. In the very case of Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1, 22 N. E. 387, the phrase "common lands" is used to refer to the lands which, by the town trustees, had been allotted among the proprietors, and also to refer to the very lands which, since the law of 1818, have been managed by the trustees elected by the proprietors. See pages 12, 13, 116 N. Y., and pages 390, 391, 22 N. E. And in the case of Post v. Pearsall, 22 Wend. 459, 460, the court, speaking of a grant precisely like this one to one of the towns of Long Island, refers to the lands owned by the town as common or public lands formerly vested in trustees, and now vested in the towns themselves. So far as contemporaneous construction of this statute by the parties interested is concerned, it appears that from the time of the passage of the act the new trustees elected by virtue of it controlled the beaches, and made regulations with regard to them, and that no objection was made to this until 1885, and no claim made by the trustees of the freeholders to any right whatever to the management of these lands. The last proviso in express terms refers to the "beforementioned premises," and all the undivided lands, whether uplands, meadows, shores, or lands under water, had been mentioned in that act before the proviso in question. This is merely a saving clause to protect any rights or interests which any person or inhabitants may theretofore have acquired in any of the premises covered by the act. It was an express declaration that there was no intent to interfere with any vested rights of persons or inhabitants of the town. The legislature did not pretend to know or to determine what such rights might be, if any.

The language of the act is plain, and no rules of construction enable the courts to give it a different meaning from that which is clearly expressed. We must conclude, therefore, that the power to sell the beach or shore, and vest title in the purchaser, of which beach or shore the property in question is a part, was, by the act of 1818, conferred upon the trustees for the proprietors, and the title thereto was thereafter transferred to and vested in the defendants, who held the same at the time this action was commenced and the judgment appealed from was rendered. The plaintiffs had no claim to the property upon which they could base their right of action. They did not seek to maintain the action upon any other basis than a title to the property. The court therefore very properly ordered a verdict for the defendants.

The judgment dismissing the complaint, with costs, was properly rendered, and should be affirmed, with costs.

VAN BRUNT, P. J., and RUMSEY and PARKER, JJ., concur. INGRAHAM, J., concurs in result.